UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA                          **DECISION**
                                                        **and**
        v.                                          **ORDER**
                                                  _____

CRAIG E. SIKUT,                                    **REPORT**
                    Defendant.                       **and**
                                              **RECOMMENDATION**

                                               **06-CR-184A(F)**
_____

APPEARANCES:              TERRANCE P. FLYNN
                          UNITED STATES ATTORNEY
                          Attorney for the Government
                          GREGORY L. BROWN
                          Assistant United States Attorney, of Counsel
                          Federal Centre
                          138 Delaware Avenue
                          Buffalo, New York  14202


                          JOSEPH B. MISTRETT
                          FEDERAL PUBLIC DEFENDER
                          Attorney for Defendant
                          JOHN F. HUMANN
                          Senior Litigator, of Counsel
                          300 Pearl Street, Suite 450
                          Buffalo, New York  14202


                         **JURISDICTION**

        This case was referred to the undersigned by the Hon. Richard J. Arcara on

October 17, 2006 for all pretrial matters (Doc. No. 23).  The matter is presently before

the court on Defendant's motion to suppress evidence and for  non-dispositive relief

(Doc. No. 14) ("Defendant's motion"). [1]

# BACKGROUND

Defendant Craig E. Sikut ("Defendant" or "Sikut") was indicted in a three-count indictment on June 7, 2006 ("Indictment"), charging Defendant with knowingly and unlawfully possessing "identification documents that appeared to be identification documents issued by and under the authority of the United States," in violation of 18 U.S.C. § 1028(a)(6), Indictment at 1-2, ("Count I"); "knowingly and willfully" making a "materially false, fraudulent, and fictitious statement and representation," in violation of 18 U.S.C. § 1001(a)(2), at 2-3, ("Count II"); and "knowingly and unlawfully manufactur[ing] and possess[ing] badges, identification cards and other insignia, and colorable imitations thereof, which were of a design prescribed by the heads of" various government agencies, in violation of 18 U.S.C. § 701, Indictment at 3-4, ("Count III"). Defendant's motion was filed July 20, 2006 along with a memorandum of law in support ("Defendant's Memorandum") (Doc. No. 14) ("Defendant's Motion").  The Government filed its response and cross-motion for discovery on August 4, 2006.  ("Government's Response") (Doc. No. 15).  An evidentiary hearing on Defendant's motion to suppress was conducted August 24, 2006, and continued on September 1, 2006.  Oral argument was deemed unnecessary.

Based on the following, Defendant's motion should be GRANTED in part,

---

[1]  Although Defendant's motion seeks both dispositive and nondispositive relief, the court addresses all issues in this combined Decision and Order and Report and Recommendation in the interest of efficiency.

DENIED in part, and DISMISSED in part as moot.

# FACTS [2]

The charges in the Indictment arise from evidence obtained by local police during a warrantless entry, search and seizure conducted by the police at 429 Third Avenue, Williamsville, New York, a townhouse unit and the residence of Defendant's parents ("the Sikut apartment" or "the apartment").  At 3:52 p.m., on March 20, 2005, Town of Amherst police received a 911 telephone call from a "refused," *i.e.*, anonymous or unidentified neighbor, who refused to identify herself, reporting "a domestic" at 429 Third Avenue.  Gov't Exh. 1; Tr.I 15; Tr.II 334-36. [3, 4, 5]  Specifically, the caller stated that noise in the Sikut apartment "sounds like a physical fight, you can hear people going at the walls, rumbling down the stairs, it's really aggravating."  Gov't Exh. 1.  At 3:54 p.m., the 911 dispatcher directed Amherst Police Officer Kevin Stephens ("Stephens"), then on routine patrol duty, to investigate the reported "domestic."  Tr.II 334.  In the radio communication, the dispatcher notified Stephens that Amherst Police

---

[2] Taken from the pleadings and papers filed in this proceeding.

[3] "Tr." references are to pages of the hearing transcripts of an evidentiary hearing conducted on August 24,2006 and September 1, 2006 filed in this case.  References to "Tr. I___" are to the transcript from the August 24, 2006 hearing (Direct and Cross-Examination of Town of Amherst Police Lieutenant Stephen McGonagle).  "Tr. II___" refers to the transcript from the September 1, 2006 hearing (the Direct, Cross, Redirect and Recross Examinations of Town of Amherst Police Officers Kevin Stephens and Nicholas Scioli, and Mrs. Marie B. Sikut, Defendant's mother).

[4] "Gov't Exh.___" references are to the Government's exhibits filed in opposition to Defendant's motion.  "Gov't Exh. 1" refers to the transcripts of the March 20, 2005, 911 call.  "Gov't Exh. 3" consists of two photographs of Defendant's computer bag depicting an emblem of an eagle and the words "The White House" on it ("the computer bag") and to which Defendant's alleged false identification is attached.

[5] "Deft Exh.___" references are to the Defendant's exhibits in support of Defendant's motion.

had received a similar 911 phone call in January 2005 also from a refused neighbor who reported a domestic at the same location which report, upon investigation, "turned out not to be a domestic [*sic*] the elderly male fell in the kitchen."  Gov't Exh. 1. Stephens testified that he did not know the family name of the residents at 429 Third Avenue when he arrived on the scene on March 20th, but acknowledged that he, Stephens, had investigated the reported domestic at 429 Third Avenue approximately four months earlier, as described in the dispatcher's communication to him on March 20, 2005.  Tr.II 128.  Specifically, Stephens responded to the dispatcher that he was familiar with the previous call and investigation regarding that call because he was present during the earlier investigation.  Gov't Exh. 1.  Stephens also testified that he had stated to the dispatcher that the elderly residents at the 429 Third Avenue address, who were the subjects of the refused neighbor's 911 call on March 20,  "should be alright."  *Id.*

Stephens was the first officer to arrive at the scene at 3:56 p.m.  Def. Exh. 1 ("Amherst Police Complaint/Information"); Tr.II 334.  Upon arrival, Stephens knocked on the front door of the Sikut apartment, rang the doorbell and announced himself as a police officer, thereby attempting, unsuccessfully, to make contact with the residents. Tr.II 117-18.  Stephens continued in his effort to contact the residents inside the apartment until Amherst Police Officer Nicholas Scioli ("Scioli") arrived at the scene less than ten minutes later to assist Stephens.  Tr.II 118, 225.  Scioli and Stephens testified that they continued trying to contact the residents, and Stephens instructed the police dispatcher to call the residents on the phone and "tell them to answer the door."  Tr.II 118; Gov't Exh. 1.  The dispatcher, however, responded to the officers that he was

4

unable to do so as the residents had an unlisted phone number.  Gov't Exh. 1.

According to Scioli, the officers could not see inside the apartment because the window

shades were down.  Tr.II 228-29.  Scioli further stated that from outside, the officers

detected no signs of activity within the apartment.  Tr.II 228-29; Gov't Exh. 1.

At approximately 4 p.m., Mr. and Mrs. Sikut, Defendant's parents, left the

residence by car on their way to church services and observed a police officer,

presumably Stephens, sitting in a patrol car in front of the apartment.  Tr.II 283-84, 286-

88.  As the officer was looking down when the Sikuts' auto passed by his vehicle,

however he did not notice them leave the townhouse complex. [6]  Tr.II 319.

Being unable to contact anyone within the apartment, Stephens spoke with a

woman who resided in an adjoining apartment who did not give her name but admitted

making the March 20, 2005, domestic 911 call.  Tr.II 129.  The neighbor, later identified

as Marsha Vallon ("Vallon"), repeated to Stephens what she reportedly heard earlier

within the Sikut apartment.  Tr.II 129.  Vallon also told Stephens that "an elderly couple

. . . lives there with their daughter."  Tr.II 129.  However, Vallon could not confirm to

Stephens that the family was then at home.  Tr.II 136.

Before deciding whether to enter the apartment to check on the residents,

Stephens requested the police dispatcher notify Amherst Police Lieutenant Stephen

McGonagle ("McGonagle"), Stephens's and Scioli's supervisor, of the situation in order

to obtain McGonagle's advice as to how the officers should proceed.  Gov't Exh. 1; Tr. II

334.  Stephens testified that, in such situations, it is customary for patrol officers to

---

[6] The testimony does not indicate that Stephens would have recognized the Sikuts based on his prior encounter with them.

contact a supervisor to determine whether exigent circumstances to justify a forcible warrantless entry to provide possible assistance are present.  Tr.I 8; Tr.II 129.  At approximately 4:07 p.m., the dispatcher informed McGonagle of Stephens's request for assistance.  Def. Exh. 1.  McGonagle testified that he overheard the original transmission between the dispatcher and Stephens following Vallon's 911 call and that, like Stephens, he, McGonagle, was therefore aware "there had been a prior domestic [911] call which turned out to be the elderly gentleman falling" when he arrived at the Sikut apartment.  Tr.I 16-18, 23-24.  McGonagle recalled he arrived at the scene between 4:30 and 5:00 p.m., or approximately 30 to 45 minutes after Stephens's arrival at 3:56 p.m.  Tr.I 22.

Upon his arrival, McGonagle attempted to enter the premises by trying to open the doors and windows.  Tr.I 25.  McGonagle estimated the officers spent approximately 15 minutes from the time McGonagle arrived until the time of the officers' initial entry of the apartment investigating the matter to determine its potential exigency.  Tr.I 23.  McGonagle also testified that the officers attempted unsuccessfully to locate a vehicle in the apartment's parking area that may belong to the residents of the apartment.  Tr.II 23.  Eventually, McGonagle, Stephens and Scioli entered the apartment through a patio door in the rear area of the apartment which McGonagle stated was unlocked, a fact disputed by Defendant's mother.  Tr.I 26; Tr.II 289.  Upon effecting entry, the officers repeatedly shouted "police" to announce their presence in the apartment.  Tr.I 27.

Once inside, the officers found nothing on the first floor of the apartment to indicate that a physical struggle or domestic disturbance had taken place, so they

6

proceeded to the second floor of the apartment.  Tr.I 27; Tr. II 141-143.  McGonagle and Scioli specifically testified that there was nothing suspicious or amiss on the first floor. Tr.I 27; Tr.II 231.  Stephens echoed this assessment, stating he observed no signs of a physical disturbance, including violence, blood or weapons on the first floor. Tr.II 141.  Nevertheless, the officers proceeded to inspect the second floor of the apartment and continued to shout "police" as they ascended the stairs to the second floor where, in one of the bedrooms, they observed a middle-aged male ("Sikut"), who "appeared to be sleeping."  Tr.I 27-28.

Upon being awakened by the officers, Sikut, who displayed a somewhat confrontational attitude, identified himself as the son of the apartment's residents.  Tr.II 147-48, 236-37, 275-78.  At this point, the officers were no longer concerned for the welfare of the elderly couple because they had already checked each of the rooms on the apartment's second floor within minutes of encountering Sikut, as no injured persons were located in the bedrooms, and as Sikut had stated his parents were the residents of the apartment.  Tr.I 35-36; Tr.II 147-48, 264.  Scioli testified, candidly, that the officers did not have probable cause to believe that any crime had been committed, nor that the officers believed the elderly couple or their daughter had been victims of foul play by anyone, including Sikut.  Tr.II 263-64.  However, notwithstanding the absence of any indication that a resident had been harmed, the officers proceeded to investigate Sikut's identity and presence in the apartment because they were unsure whether he had permission to be in the apartment as the neighbor, Ms. Vallon, had not mentioned that a younger male resided there, only that the elderly couple resided at the apartment with their daughter.  Tr.II 147-48.

7

According to Stephens, upon being awakened by the police, Sikut appeared agitated and nervous.  Tr.II 147.  After encountering Sikut, the officers did not inquire of Vallon if any other family members resided in, or visited, the apartment or if she was aware that the Sikuts had a son as well as a daughter, nor did they attempt to investigate with any neighbors whether Sikut was permitted to be at the apartment. Tr.II 148; Tr.II 270-71.  Scioli admitted that Sikut's confrontational attitude toward the officers upon being awakened by them contributed to their decision to further investigate Sikut's asserted identity and presence at that point.  Tr.II 277.

While Sikut was still in the bed, the officers asked Sikut for identification, but Sikut was "uncooperative" and demanded the officers to leave.  Tr.I 36.  Nevertheless, after a short period of time, Sikut got out of bed and identified himself as Craig F. Sikut, born March 3, 1960.  Tr.I 37-39.  Sikut informed the officers that he lived in the apartment and that his parents, the elderly couple, were then not at home.  Tr.I 39.  In an attempt to corroborate this assertion, Sikut pointed the officers to a photograph of himself that was in the bedroom.  Tr.II 268.  However, the person in the photograph did not sufficiently resemble Sikut in the estimation of the officers.  Tr.II 182.  Despite this unsuccessful demonstration by Sikut of his identity, after five to seven minutes, the officers ordered Sikut downstairs to produce other identification.  Tr.I 41.  According to McGonagle, the officers directed Sikut downstairs because the bedroom was too confined an area to permit a safe continuation of their investigation, and the officers were uncertain whether any weapons could be accessible to Sikut within the bedroom. Tr.I 41.  At this point, the police had not observed or searched either Sikut's briefcase or computer bag.

8

Upon being escorted to the apartment's first floor downstairs, Sikut, who had, at some point, also claimed he was a federal agent, produced, at the officers' request, a business card purportedly from an unidentified federal agency. Tr.I 42. However, the business card identified Defendant as Craig E. Sikut, not Craig F. Sikut, the middle initial Sikut had previously given to the officers while they were in the bedroom. Tr.I 43. In response to the officers' questioning about the apparent discrepancy in his middle initials, Sikut responded that the middle initial on his business card was a printing error. Tr.I 43. Sikut did not provide a driver's license, [7] badge or any other official identification as a federal employee. Tr.I 43. Because the officers considered the business card insufficient evidence of Sikut's identity, Tr.I 42-43, McGonagle ordered Stephens to leave the apartment in order to conduct a radio check for any possible outstanding criminal warrants against Sikut. Tr.I 44. [8]

Meanwhile, Sikut continued to demand that the officers leave the residence, but McGonagle informed Sikut that Scioli and McGonagle would wait in the front hallway of the apartment, and the two officers would depart "if everything checked out." Tr.I 48. According to McGonagle, at that point the officers were attempting to verify Sikut's correct identity because the elderly couple residents were not present, had not returned to the apartment, and they "wanted to make sure that [Sikut] belonged in the house . . . [because the police] . . .[m]ight have had a burglary or an assailant or just somebody

---

[7] The record does not indicate whether the officers asked Sikut to produce a driver's license.

[8] Stephens testified that when he investigated the previous 911 call which reported a domestic at the Sikut apartment, the officer did not ask Mr. or Mrs. Sikut for identification, nor did he run a warrant check on any persons in the apartment. Tr.II 183-84.

that didn't belong there for whatever reason [*sic*]."  Tr.I 45 (Bracketed material added).

McGonagle further explained that this advice to Sikut meant that the officers would

leave once Sikut's identification and employment were verified, and it was established

that he belonged in the house.  Tr.I 48.

While Stephens was at the squad car conducting the warrant check by police

radio, McGonagle directed Scioli to stand with his foot in the doorway of the apartment,

thereby keeping the outside apartment door ajar in order to maintain his position should

the officers need to reenter the apartment.  Tr.I 48.  As McGonagle walked toward the

police car "to check on Officer Stephens' [*sic*] progress [in completing the warrant

check]"  Tr.I 48, Sikut began to push Scioli out of the apartment doorway and

attempted to close the door on Scioli's foot.  Tr.I 48.  Observing this altercation,

McGonagle came to Scioli's assistance.  Tr.I 48.  Both officers then pushed the

apartment front door open, reentered the apartment, and instructed Sikut to sit down on

a chair or sofa in the living room.  Tr.I 49.  Stephens testified that the officers' purpose

for reentering the house at that point was to prevent injury to Scioli's foot and arrest

Sikut for harassment of a police officer, a violation under New York law; however,

according to Stephens, only Scioli could have  lawfully arrested Sikut on such a charge

under New York law because it was Scioli who had witnessed the harassment.  Tr.II

196, 199-200.  Nevertheless, Scioli did not intend to arrest Sikut for harassing him

immediately upon Scioli's reentry into the apartment. Tr.II 253.

After Scioli and McGonagle reentered the apartment, Stephens's warrant check

confirmed the existence of two outstanding warrants for Sikut from the Town Court of

Hamburg, New York, another local township, for trespass and harassment, respectively,

a violation and a misdemeanor under New York law. [9]  Tr.I 50-51; Tr.II 246; Exh. 1.  The

warrant check also confirmed that a male named Craig E. Sikut resided at 429 Third

Avenue, Amherst, New York, however, the date of birth and middle initial, F.,  Sikut

provided to the officers differed from those which appeared on the warrants. [10]  Tr.II

155.  Once inside the apartment, Stephens asked Sikut for his correct name, to which

Sikut responded by reaching for a laminated business card attached to a briefcase near

the couch where Sikut was seated, Tr.I 55-56, on which was printed the name Craig E.

Sikut.  Tr.II 156.  The officers inspected the business card but, for reasons of officer

safety, Sikut was prevented from handling the card or the briefcase.  Tr.I 57.  When

Stephens informed Sikut that Craig E. Sikut was the name on an outstanding warrant,

Sikut stated that the name on the card was also a misprint.  Tr.II 156.  Although

McGonagle could not recall exactly when, at some point while the officers were in the

apartment, Sikut stated that he was not currently a law enforcement officer or federal

agent but had previously been such an officer or agent.  Tr.I 72.  Sikut, who resisted the

officers' attempt to arrest him resulting in the officers' wrestling Sikut to the floor and

forcibly handcuffing him, was then arrested on the outstanding local warrants and for

state charges of false personation, harassment of a police officer, and resisting arrest.

Tr.I 61; Tr.II 160-61, 171.

　　　After Sikut was placed in Scioli's patrol car, Tr.II 161, Stephens reentered the

---

[9] Throughout their testimony, the officers refer to the outstanding warrant as one warrant from the Town of Hamburg; however the transcript of the call between Stephens and the dispatch officer reveals there were two outstanding warrants for Sikut from the Town of Hamburg.  Gov't Exh. 1.

[10] According to the warrant check, Craig E. Sikut was born May 11, 1957 and then resided at 429 Third Avenue, Amherst, N.Y.  Tr.II 157; Gov't Exh. 1.

house to verify that no weapons were in Sikut's briefcase, and "to see if [Sikut] really did have identification in [the briefcase]." Tr.II 161.  At that point, according to Stephens, the briefcase was already lying open before Stephens inspected it and Stephens observed what appeared to be a federal identification badge on top of other material inside the briefcase.  Tr.II 162.  As Stephens removed the badge, Stephens also observed six or seven more documents which also appeared to be federal identification documents associating Sikut with various federal  agencies.  Tr.II 162, 168.  Stephens suspected that the identification documents were fraudulent and informed McGonagle what he discovered.  Tr.II 169.  McGonagle then contacted his supervisor and requested the number for the local field office of the Federal Bureau of Investigation ("FBI").  Tr.II 169.  McGonagle spent approximately 20 minutes on the phone with an FBI officer, during which time Scioli remained in the patrol car with Sikut.  Tr.II 169, 170. At McGonagle's instruction, Stephens then reentered the townhouse to retrieve Sikut's computer bag and computer. [11, 12]  Tr.II 170-71.  According to Stephens, these items were seized from the apartment because the officers suspected the identification badges were forged documents, and that the computer they had observed in the apartment, on which was what appeared to be the official White House seal, was property of the federal government stolen from a federal  agency. Tr.II 173-75.  It is undisputed that except for Sikut's arrest on the outstanding local court warrants, the

---

[11] At the hearing, the officers used "bag" and "briefcase" interchangeably to describe the evidence they seized from the Sikut apartment.  However, according to McGonagle's testimony, Tr.I 73, and Defendant's Memorandum at 20, the evidence seized included a leather briefcase, a laptop computer and a computer case.

[12] Stephens did not state whether he also reentered the apartment to seize the leather briefcase.

officers' actions were taken without a warrant.  Mrs. Sikut testified regarding a forced

entry of the apartment and that the family may have observed either Stephens or Scioli

sitting in a police car in front of the apartment as they drove away to attend church

services.  Tr.II 284, 286-288.  Sikut did not testify.[13]

## DISCUSSION

### I.    Motion for a Bill of Particulars

Defendant requests, pursuant to Fed.R.Crim.P. 7(f) ("Rule 7(f)"), a bill of

particulars seeking details as to the alleged violations under the Indictment.

Defendant's Motion ¶ 2.  Specifically,  Sikut seeks particularization of the specific dates,

locations and circumstances when and where he allegedly misrepresented himself as a

United States official after October 4, 1996.  Defendant's Motion ¶ 6; (Indictment Count

II).     Additionally, Sikut requests particulars regarding the specific dates between July

2001 and March 20, 2005 on which it is alleged that Sikut engaged in the knowing,

unlawful manufacture and possession of "badges, identification cards, and other

insignia."  *Id.*; (Indictment Count III).[14]

Under Fed.R.Crim.P. 7(f), a court may direct the filing of a bill of particulars as

justice requires.  The decision as to whether to direct further particularization is within

the discretion of the court.  *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984).

The test as to whether to order particularization is "whether the information sought is

---

[13]  All witnesses testified credibly.

[14]  Defendant does not seek particularization regarding Count I.

necessary, not whether it is useful." *United States v. Matos-Peralata*, 691 F.Supp. 780,

791 (S.D.N.Y. 1988), *aff'd sub nom., United States v. Benitez*, 920 F.2d 1080 (2d Cir.

1990).  The court will not order particularization where the government has provided the

information requested either "in the indictment or some acceptable alternative form."

*United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir. 1987); *United States v. Feola,*

651 F.Supp. 1068, 1133 (S.D.N.Y. 1987) (whether the information sought has been

provided elsewhere, such as in other items provided by discovery, responses made to

unobjected requests for particulars, prior proceedings, and the indictment itself, may be

considered in deciding whether to order particularization)*, aff'd*, 875 F.2d 857 (2d Cir.

1989), *cert. denied sub nom., Marin v. United States,* 493 U.S. 834 (1989).  A bill of

particulars should only be required "where the charges in the indictment are so general

that they do not advise the defendant of the specific acts of which he is accused."

*Feola*, *supra,* at 1132.  Further, "[a]cquisition of evidentiary detail is not the function of

the bill of particulars."  *United States v. Torres*, 901 F.2d 205, 234 (2d Cir.) (denying

request for bill of particulars identifying unindicted alleged co-conspirators referred to in

indictment as 'known and unknown' on the basis that such information was

unnecessary to advise defendants of the specific acts of which they were accused),

*cert. denied sub nom., Cruz v. United States*, 498 U.S. 906 (1990).

Defendant is charged in Count II of the Indictment with knowingly and willfully

misrepresenting himself as a government official to government agents after October 4,

1996.  (Indictment Count II).  The Government represents it provided to Defendant,

through voluntary discovery, various documents in which Defendant misrepresented

14

himself as a government agent after October 4, 1996, including an application for a

United States Post Office Box address at a post office in Amherst, New York and e-mail

correspondence.  Government Response at 5.  The court finds the information outlined

by the Government and provided to Defendant in discovery documents sufficiently

describes the conduct of which Defendant is accused so as to avoid undue surprise at

trial.  The additional details Defendant seeks therefore are not necessary to further

inform Defendant of the specific acts of which he is accused.  Consequently,

Defendant's request for further details concerning the circumstances and identity of

persons to whom Defendant made the alleged false representations, is DENIED.

As noted, Count III of the Indictment charges Defendant with substantive crimes

which occurred between July 2001 and March 20, 2005 "in the Western District of New

York, and elsewhere," in violation of 18 U.S.C. § 701.  (Indictment Count III).  In tracking

the language of the statute, the Indictment provides considerable detail by stating that

Defendant

> . . . did knowingly and unlawfully manufacture and possess
> badges, identification cards and other insignia, and colorable
> imitations thereof, which were of a design prescribed by the
> heads of the United States Department of Defense, the
> State Department of the United States, the United States
> Central Intelligence Agency, the United States National
> Military Command Center, and the United States National
> Security Council, which are departments or agencies of the
> United States, for use by officers and employees of such
> departments and agencies, without authorization under
> regulations made pursuant to law.  All in violation of Title 18,
> United States Code, Section 701.  (Indictment Count III).

As stated, Count III of the Indictment tracks the language of the statute, 18

U.S.C. § 701, alleging that Defendant manufactured and possessed badges, other

insignia, "and colorable imitations thereof," characterized by designs utilized by the heads of various United States Departments and Agencies, as specifically identified in Count III, without their permission to do so.  Further, Count III identifies the statute Defendant allegedly violated by committing these acts, 18 U.S.C. § 701, thereby fully advising Defendant of the charges against him.  Moreover, a fair reading of Count III and the Indictment as a whole provides sufficient detail of the substance of the charges and the dates and locale of the alleged conduct.  As such, the Indictment sufficiently informs Defendant of the nature of the charges against him to permit adequate trial preparation and avoidance of unfair surprise without formal particularization as Defendant requests.  Such detailed allegations in the Indictment, together with the extensive voluntary discovery provided Defendant by the Government, undisputed by Defendant, do not warrant the requested particularization.  Defendant's motion for a bill of particulars is therefore DENIED.

**II.      Request for Further Discovery**

Defendant seeks further discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure.  In particular, Defendant requests all radio transmissions regarding the March 20, 2005 incident at the Sikut apartment involving Defendant and similar act evidence on which the Government intends to rely at trial.  Defendant's Motion ¶¶ 3, 7. Additionally, Defendant seeks the names and qualifications of the Government's expert witnesses, the subject of their testimony, and information under Rules 702, 703 or 705 of the Federal Rules of Evidence.  Defendant's Motion ¶ 5.  Finally, Defendant requests rough notes made by law enforcement agents concerning this case.  Defendant's

Motion ¶ 8.

**A.      Radio Transmissions**

The Government represents it has requested from the Amherst Police

Department available recorded copies of the 911 police call regarding the domestic

disturbance alleged to have taken place at the Sikut apartment on March 20, 2005, and

that, when received, the Government will forward these copies to the Defendant.

Government Response at 4-5.  Based on the Government's representation, the court

DISMISSES as moot Defendant's request for police radio transmissions records

concerning the incident on March 20, 2005, including the relevant 911 calls.

**B.      Identification of Expert Witnesses**

The Government states it does not intend to call expert witnesses pursuant to

Rule 702 of the Federal Rules of Evidence.  Government Response at 5.  As such,

Defendant's request for names, qualifications and subjects of the testimony of the

Government's expert witnesses is DISMISSED as moot.

**C.      Similar Acts Evidence**

The Government represents it will not introduce any evidence of similar acts as

part of its case-in-chief.  Government Response at 5.  As such, Defendant's request for

evidence under Fed.R.Evid. 404(b) is also DISMISSED as moot.

**D.      Preservation of Rough Notes**

The Government states it has advised law enforcement officers associated with

this case that they must preserve all rough notes regarding the investigation, and

represents that it will provide Defendant with all such rough notes at the same time it

produces statements of testifying witnesses pursuant to the Jencks Act, 18 U.S.C. §

3500.  Consequently, Defendant's request for the preservation of rough notes is

DISMISSED as moot.

### E.     Government's Cross-Motion for Discovery

The Government moves for reciprocal discovery pursuant to Fed.R.Crim.P.

16(b)(1)(A).  Defendant has not opposed this request.  Accordingly, the Government's

motion is GRANTED.  Defendant shall provide such discovery, if any, **not later than 30**

**days prior to trial or such other date as the District Judge may direct.**


### III.    Defendant's Motion to Suppress

Defendant moves to suppress physical evidence belonging to Defendant seized

by Stephens from the Sikut apartment on March 20, 2005.  Defendant's Motion ¶ 1.

Such evidence includes the alleged false federal identification documents, a laptop

computer and computer case, a leather briefcase from which the documents were

taken by the police officers, and any other items seized by the police officers at the

Sikut apartment on March 20, 2005.  Defendant's Memorandum at 20; Government

Response at 2.  Specifically, Defendant contends, contrary to the Government's

position, that (i) exigent circumstances were not present at the time of the warrantless

entry into the dwelling; (ii) an objectively reasonable police officer would not find exigent

circumstances in this case based on the anonymous 911 call and the totality of the

circumstances then presented to the officers who responded to the 911 call prior to

entry; (iii) the delay by the investigating police officers of about 45 minutes after their

18

arrival prior to their decision to enter the apartment demonstrates that it was not objectively reasonable, based on the information available to the officers, to believe that a person inside the apartment was seriously injured and required police assistance; (iv) the police officers' testimony is not credible; (v) assuming, *arguendo,* that exigent circumstances were present at the time of entry, such exigency terminated when the police discovered no one injured and no evidence of abuse within the apartment prior to the seizure of the evidence; (vi) once the officers left the premises, they had no right of reentry to effect the seizures without a warrant; and (vii) upon Defendant's arrest and being placed in the patrol car, the officers required a warrant or consent to reenter the premises to conduct any search and seizure of Defendant's briefcase and computer bag. Defendant's Memorandum at 2-20.

The Government opposes Defendant's motion, arguing that (i) exigent circumstances permitted the officers' warrantless entry of the residence; (ii) exigent circumstances were present while the officers investigated Sikut's actual identity and presence in the apartment; (iii) the officers had probable cause to believe Sikut had committed false personation under state law; and (iv) because exigent circumstances and probable cause existed, the evidence in plain view was properly seized. Government Response at 9-20. Based on the record, the court finds that Defendant's motion to suppress should be GRANTED.

## A.      The Officers' Warrantless Entry

The Fourth Amendment to the United States Constitution protects the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. *Arizona v. Evans,* 514 U.S. 1 (1995).

19

The Fourth Amendment provides that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

Generally, a warrant is required before a search and seizure may be conducted, unless one of the exceptions to the warrant requirement exists. *Arizona v. Hicks,* 480 U.S. 321 (1987). One exception to the warrant requirement is the exigent circumstances exception. Where exigent circumstances are present, law enforcement may execute the warrantless entry of one's home to effect a search or seizure. *United States v. MacDonald,* 916 F.2d 766, 769 (2d Cir.), *cert. denied,* 498 U.S. 1119 (1991).

"A district court's determination as to whether exigent circumstances existed is fact-specific, and will not be reversed unless clearly erroneous." *MacDonald, supra* at 769 (citing *United States v. Cattouse,* 846 F.2d 144, 146 (2d Cir.), *cert. denied*, 488 U.S. 929 (1988)). "The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an "<u>urgent need</u> to render aid or take action." *Anthony v. City of New York,* 339 F.3d 129, 135 (2d Cir. 2003) (underlining added). A warrantless entry is justified if, based on the totality of the circumstances known to the investigating officer(s) at the time of entry, it was objectively reasonable for the officer to enter without a warrant. *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) (citing *Mincey v. Arizona,* 437 U.S. 385, 392 (1978)); *McDonald, supra* at 769; *United States v.*

*Schaper,* 903 F.2d 891, 894 (2d Cir. 1990); *United States v. Miles,* 889 F.2d 382, 383

(2d Cir. 1989) (*per curiam*); *United States v. Zabare,* 871 F.2d 282, 290-91 (2d Cir.),

*cert. denied,* 493 U.S. 856 (1989).  It is the government's "heavy burden" to establish

the presence of an exception to the warrant requirement.  *Welsh v. Wisconsin,* 466 U.S.

740, 750 (1984); *United States v. Arboleda,* 633 F.2d 985 (2d Cir. 1980), *cert. denied,*

450 U.S. 917 (1981).

"'[P]olice officers may enter a dwelling without a warrant to render emergency aid

and assistance to a person whom they reasonably believe to be in distress and in need

of that assistance.'"  *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) (quoting

*Root v. Gauper*, 438 F.2d 361, 364 (8th Cir. 1971)).  Here, the Government maintains

that the police officers' belief that someone inside the Sikut apartment was in danger

and required assistance was objectively reasonable.  Government Response at 10-14.

### 1.    Anonymous 911 Call

The court first considers whether the 911 call by an anonymous neighbor

supports an objective determination that exigent circumstances were present when the

officers entered the apartment on March 20, 2005.  The Second Circuit has held that

anonymous, uncorroborated 911 calls do not alone justify the warrantless entry of a

home.  *Kerman v. City of New York,* 261 F.3d 229, 238 (2d Cir. 2001) ("police officers

may not rely on an anonymous and uncorroborated 911 call to justify a warrantless

entry into a private dwelling").  In this case, the Government argues that, at the time of

the officers' warrantless entry, the 911 caller was not anonymous.  Government

Response at 11-12.  Specifically, the Government contends that the caller was no

longer anonymous because Stephens, prior to entry of the apartment, spoke in person with the neighbor who confirmed to Stephens, Tr.II 129, that she had made the 911 call reporting what she believed was a domestic disturbance at the Sikut apartment, albeit she did not provide her name. Government Response at 12.  According to the Government, at that point in the investigation, "[the caller] was an identifiable person, at an identifiable location upon whom the officer could reasonably rely to provide truthful and accurate information."  Government Response at 12.  Defendant nevertheless contends the 911 call does not suggest the circumstances were exigent, that the 911 call was anonymous and uncorroborated, and that the caller was objectively unreliable. Defendant's Memorandum at 3-4.

Irrespective of whether the caller remained anonymous at the time of the warrantless entry, the court finds that reliance by the officers on the 911 call to establish exigent circumstances was, on this record, objectively unreasonable.  "In justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  *Terry v. Ohio,* 392 U.S. 1, 21 (1968).  It is necessary that the facts available to the officer would cause a person of "reasonable caution" to believe that the intrusion was necessary.  *Id*. at 21-22.  Significantly, Stephens, the first officer to arrive at the scene, recollected investigating, about four months earlier, a similar 911 report of a domestic disturbance at the apartment, also by a refused neighbor, which, as the 911 dispatcher on March 20, 2005 reminded Stephens, "turned out not to be a domestic." Gov't Exh. 1.  According to the transcript of the March 20, 2005, 911 call, Stephens, in

response to the dispatcher's statement, expressed his belief to the 911 dispatcher that the elderly couple, who Stephens then recalled resided at the Sikut apartment, "should be alright."  Gov't Exh. 1. [15]

The Second Circuit has recognized the "combustible nature of domestic disputes," which provides "great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger." *Tierney,* 133 F.3d at 197. However, courts have held that domestic violence situations are not *per se* exigent, *United States v. Najar,* 451 F.3d 710, 719 (10th Cir. 2006), *cert. denied*, 127 S.Ct. 542 (2006), and that "there is no domestic abuse exception to the Fourth Amendment, generally."  *United States v. Black*, 466 F.3d 1143, 1147 (9th Cir. 2006).  The Second Circuit has upheld an officer's determination that exigent circumstances, based on asserted domestic violence, were present where the anonymous call was made by the victim from the location to which police were responding.  *Anthony,* 339 F.3d at 136-37. Specifically, in that case the court found that the substance of the 911 call created exigent circumstances because the caller expressed the belief that she faced "an immediate and deadly threat of harm."  *Id.*  Here, the 911 call was placed by a neighbor who refused to identify herself, not by the alleged victim, nor from a person within the potential victim's residence.  Gov't Exh. 1; Tr.I 15; Tr.II 334-36.

Additionally, contrary to the facts in *Anthony, supra*, the information provided by

---

[15] While the testimony did not establish, definitively, that the caller on each occasion was the same person, taken as a whole, the record strongly supports such a finding.  McGonagle "strongly suspected" this was the case, Tr. II 19, the Government concedes as much.  Government Response at 12.

the 911 caller in the instant case was not unambiguously indicative of a recent domestic dispute involving personal violence.  Rather, the 911 caller stated that "some degree of commotion" daily transpires at the residence and asserted that the noise "sounds like a physical fight, you can hear people going at the walls, rumbling down the stairs . . . ." Gov't Exh. 1.  When Stephens spoke with the neighbor, she described "family arguments" as occurring at the apartment.  Tr.II 133.  Although as described by the neighbor, such sounds may have been caused by "family argument[s]", they are also consistent with people noisily running up or down stairs, and loud and even offensive talking.

That it was objectively unreasonable for the investigating officers to conclude exigent circumstances justified their warrantless entry of the Sikut residence is tellingly supported by the relevant transcript of the 911 call which demonstrates, unequivocally, contrary to the Government's contention, that, upon arriving at the scene, Stephens did not believe that the elderly couple residing at the apartment were in imminent danger. Rather, according to his own statement to the dispatcher, Stephens believed, prior to the warrantless entry at issue, that the unidentified caller was probably incorrect in believing that a domestic disturbance at the Sikut apartment had occurred when she telephoned 911, on March 20, 2005, even stating to the 911 dispatcher that the elderly couple "should be alright."  Gov't Exh. 1.

It was also unreasonable for McGonagle, who overheard the entire communication between Stephens and the dispatcher, Tr.I 16-18, prior to the later entry by the officers now led by McGonagle, into the apartment, to conclude that the elderly couple who resided there were likely in danger.  The officers failed to explain at the

24

hearing, and the Government provides no rationale in its Response, why the officers believed the caller, Ms. Vallon, the Sikuts' neighbor, had accurately described an incident involving domestic violence.  Particularly, Stephens's face-to-face conversation with Vallon did not produce any additional information not previously developed by Stephens and Scioli's investigation demonstrating any immediate need for the subsequent warrantless entry.  Rather, Stephens was aware that a prior 911 caller reporting a domestic disturbance at the Sikut residence had used the same or very similar language to describe the asserted commotion the caller then overheard from within the apartment, and that this earlier assessment of domestic violence at the apartment had proved to be inaccurate, as revealed by the officer's investigation on that occasion. [16]  Under ordinary circumstances, an officer's assessment based on personal contact with a 911 caller may require a court defer to the officer's determination that the caller was credible.  However, where, as here, the officer had acknowledged reasons for doubting the accuracy of the caller's perception of danger without independent evidence of such danger, deference is warranted.  Thus, the court finds that, based on Stephens's awareness of the prior domestic call regarding the Sikut residence, which failed to show any need for police assistance and the absence of independent evidence directly corroborating the present caller's complaint, it was not objectively reasonable

---

[16]  Stephens testified the prior 911 caller reportedly heard bumping against the wall at the Sikut apartment, and the call "came out as a domestic."  Tr.II 183.  On March 20, 2005, the caller stated to the 911 dispatcher she heard "banging into the walls, rumbling down stairs," and yelling.  Tr.II 129. Significantly, the caller also reported "it [the noises emanating from the Sikut apartment] was an ongoing issue."  Tr.II 129.  The fact that, on both occasions, the caller reported hearing similar sounds inside the apartment ("bumping against the wall" four months earlier, Tr.II 183, and banging into the walls on March 20, 2005), that the previous caller was anonymous and that the current caller, later identified as Ms. Vallon, stated these disturbances were "ongoing," Tr.II 129, reasonably should have caused Stephens to conclude that Vallon was the prior caller as well as the current one, thereby requiring further investigation to establish Vallon's reliability or to distinguish her from the previous 911 caller.

for the officers to conclude that the 911 caller was sufficiently reliable to demonstrate that exigent circumstances were present.

## 2.  Exigent Circumstances Unsupported By Officers' Actions

Federal courts have found short delays between an officer's arrival at the scene of an alleged crime and the officer's entry of the premises do not necessarily negate the situation's exigency.  *United States v. Najar, supra,* at 719 (10th Cir. 2006) (thirty minute delay "caused by reasonable investigation into the situation facing the officer" did not preclude finding exigent circumstances), *cert. denied,* 126 S.Ct. 1022 (2006); *United States v. De Jesus-Batres,* 410 F.3d 154, 159 (5th Cir. 2005) (45 minute delay not dispositive on the presence of exigent circumstances), *cert. denied,* 126 S.Ct. 1022 (2006); *United States v. Jones*, 635 F.2d 1357, 1361 (8th Cir. 1980) (one hour delay does not negate existence of exigent circumstances); *United States v. Picariello,* 568 F.2d 222, (1st Cir. 1978) (exigent circumstances present despite six hour delay).

> When the police have a reasonable suspicion that someone is injured or that the public safety is in jeopardy, but refrain from taking immediate action in an effort to confirm or deny the suspicion, and then act once they have received no indication that the danger has been dissipated, the waiting period does not defeat the applicable exception to the warrant rule.  (citing *United States v. Kulcsar,* 586 F.2d 1283 (8th Cir. 1978).

*Jones*, 635 F.2d at 1362.

In the instant case, the officers waited approximately 45 minutes from the time Officer Stephens first arrived at the scene until the time they entered the Sikut apartment following McGonagle's arrival at the apartment.  Tr.I 22-23.  However, while a 45 minute lapse of time before entry does not, by itself, negate the possible existence

of exigent circumstances, *see, e.g., DeJesus-Batres, supra*, nevertheless courts, when faced with such delayed entries, will require that a reasonably productive investigation be conducted during the period of delay aimed at determining if exigent circumstances were objectively present.  *Jones, supra,* at 1362.

In this case, the investigation conducted by the officers from the time McGonagle arrived on the scene until the officers' warrantless entry was unproductive and misguided.  For example, the investigating officers attempted to associate a vehicle in the apartment complex's parking area with the apartment's residents, Tr.I 23; however, as both McGonagle and Stephens stated, Facts, *supra,* at 4, 6, the officers did not know the surname of the residents at 429 Third Avenue at the time of warrantless entry. Tr.I 24; Tr.II 128.  The testimony fails to explain how the officers could proceed to identify the vehicle belonging to the Sikuts or to Defendant when they did not have a name to associate with a vehicle registration number. Tr.I 23.  Further, the court fails to see how such action was calculated to ascertaining the need for a warrantless emergency entry, and the Government offers none.  Based on the record, the officers made no attempt to learn from any neighbors the name of apartment's residents or a description of their automobile.

Additionally, it is undisputed that the officers detected nothing during their further investigation at the apartment over the 45 minute period before McGonagle waived  to suggest there was any substance to the present 911 call.  The officers observed no damage to the premises, heard no noise from inside the apartment, could not confirm the residents were still at home, nor could they determine when, prior to their arrival, the noise reported by the caller had ceased.  Tr.II 135-36, 228.   No signs of physical

struggle or forcible entry were identified in the officers' testimony at the hearing.

Moreover, prior to arrival at the scene, as discussed, Discussion, *supra,* at 3-4, 20, 21,

Stephens and McGonagle had substantial reason to doubt there was a need to effect

an emergency entry into Sikut apartment based on Stephen's familiarity with the prior

911 call regarding noises from 429 Third Avenue, the Sikut apartment, and the call's

lack of substance.  Tellingly, Stephens, the first officer to arrive on the scene and the

officer who investigated the complaint of a domestic at the apartment four months

earlier, advised the police dispatcher that he, Stephens, believed the elderly couple

"should be alright."  Gov't Exh. 1 (underlining added).  McGonagle overheard the entire

conversation between the 911 dispatcher and Stephens, and, therefore, was also

aware of the prior inaccurate 911 report of a domestic at the 429 Third Avenue

apartment, and the concomitant likelihood that no danger to the residents existed on

this occasion either.  Tr.I 16-18, 24.  Thus, based upon the totality of the circumstances

known to the investigating officers, the court finds it was objectively unreasonable for

the officers to believe anyone inside the Sikut apartment was injured as a result of

domestic violence or otherwise requiring police assistance sufficient to justify a

warrantless entry under the exigent circumstances exception to the Fourth

Amendment's warrant requirement.

    The instant case is distinguishable from the facts in *Tierney*, 113 F.3d at 197-98,

where the court agreed with the officer's conclusion that, based on the totality of the

circumstances known to the officer upon arrival, exigent circumstances justified the

officer's warrantless entry.  In particular, in that case, when the officer arrived at the

scene of the alleged domestic disturbance, the anonymous caller's husband had

approached the officer, stated that his wife was the anonymous caller, and affirmed his wife's representation that there had been prior domestic altercations at that residence, this being "the worst yet." *Tierney, supra,* at 197.  Though the officer heard no noise from the residence upon arrival, he was told by neighbors the shouting from within the residence had ceased "just prior to his arrival," and the officer noticed a broken glass pane on a door to the residence "through which a hand could reach." *Id.* The court determined that these facts justified the officer's belief that the circumstances were exigent and a warrantless entry was required. *Id.*

In the instant case, the officers' assertion that they entered the apartment because they thought someone inside was likely hurt, dead or unconscious is inconsistent with the objective results of their investigation and the amount of time they spent deciding whether exigent circumstances were present before entering the apartment.  Further, unlike the facts in *Tierney,* 113 F3d. at 198, the complaining neighbor, Vallon, never represented that to her knowledge anyone in the Sikut apartment had even been assaulted or injured in the apartment, a fact consistent with the results of Stephens's investigation of the prior 911 complaint which caused Stephens to immediately believe, well before his arrival at the scene, that the occupants of the Sikut apartment were presently unharmed, as he had indicated to the 911 dispatcher.  Tr.II 133; Gov't Exh. 1.  These facts are wholly inconsistent with an objectively reasonable determination that a domestic dispute involving serious physical injuries had recently occurred within the apartment warranting warrantless police intervention.

29

McGonagle's testimony that police supervisors, such as himself, need not be contacted when supervisors are unavailable or when circumstances which justify a warrantless entry are present, Tr.I 8, 10-12, implies that it was unnecessary for Stephens and Scioli to contact McGonagle for advice if they believed exigent circumstances requiring immediate entry were present, thus supporting a finding that, prior to their entry into the apartment, neither Stephens nor Scioli believed exigent circumstances existed.  Instead, the officers assertedly notified McGonagle of the situation to enable McGonagle to determine whether exigent circumstances were present.  Tr.I 4-5, 8.   McGonagle testified that 30 to 45 minutes elapsed between the 911 call which was received by the dispatcher and McGonagle's arrival on the scene, during which no sounds of "smashing of walls" or "rumbling down stairs" as the 911 caller reported were detected by the officers. [17]  Tr.I 22.  Of course, had the situation involved actual domestic violence, a 30 to 45 minute delay could well result in significant physical harm to the putative victim otherwise preventable by swift police intervention.  However, Stephens, Scioli and McGonagle apparently did not consider their delay in entering the premises to prevent such risks to the residents.  As a result, the belated decision to enter was inconsistent with an objective sense of urgency; rather, under all of the circumstances, it more reflected one motivated by official curiosity.

It was also unreasonable for the officers to rely on Ms. Vallon as the only source

---

[17] Despite the alleged exigency of the situation, the officers spent an additional ten to fifteen minutes  "investigating," *i.e.,* examining cars in the parking lot for the townhouse in which the Sikut apartment was located, Tr.I 23, once McGonagle arrived on the scene, an apparently futile effort as the officers did not know what kind of vehicle the Sikuts owned.  *Id.*

of information corroborating the anonymous March 20, 2005, 911 call when she later admitted that she was the caller on that occasion given the officers had knowledge that a prior anonymous call alleging a domestic dispute at the Sikut residence four months earlier proved unfounded, and there was no reason to believe the prior caller was someone other than Vallon.  To determine, in light of the prior mistaken 911 call, the accuracy of Vallon's assertions, the officers could have attempted to either contact other neighbors who may have been aware of problems at the Sikut apartment, or made an effort to determine whether Vallon was the same anonymous caller who previously reported the alleged domestic at the Sikut apartment, a fact easily ascertainable by simply asking Vallon this question when Stephens discussed the latest 911 call with her, prior to McGonagle's arrival.  However, as the record reveals, the officers did neither, a fact more consistent with the absence of any objective and reasonable belief the officers were confronted with an exigent need for a warrantless entry to effect assistance.

Finally, the officers' other actions at the scene do not reflect a reasonable belief that exigent circumstances were then present and required immediate entry of the apartment.  For example, Stephens testified that he could not recall if any officer walked around the back of the Sikut residence in any attempt to make contact with the residents of the apartment, Tr.II 187, despite testifying that he and Scioli "made sure that we could not see into the residence."  Tr.II 186.  In particular, Stephens stated "[he] assume[d]" McGonagle had investigated the exterior of the premises when McGonagle arrived, but Stephens could not be sure.  Tr.II 188.  Scioli later testified he did not recollect walking to the back of the residence in an attempt to contact the residents.

31

Tr.II 227.  The record demonstrates that Stephens and Scioli were on the scene fully 30 to 45 minutes before McGonagle arrived, yet they made no attempt to contact the residents through a back door or window of the apartment.  Additionally, once McGonagle arrived, another 10 to 15 minutes passed before the officers decided to enter the residence, a delay inconsistent with an objectively reasonable belief that exigent circumstances were present in that victims of violence were inside the apartment and required police assistance .  Tr.I 23; Discussion, *supra,* at 25 n.16.

While courts should generally be reluctant to second-guess good faith decisions by police intended to protect life and limb, nevertheless, based on the totality of the circumstances presented on this record, it was not objectively reasonable for the police to conclude that exigent circumstances were present before the disputed entry. Therefore, as the seized evidence at issue was the direct fruit of such an illegal entry, in violation of the Fourth Amendment, Defendant's motion to suppress should be GRANTED.

**B.    Scope of the Search**

Alternatively, even if the Chief District Judge finds that exigent circumstances justified the warrantless entry, Defendant's motion should, notwithstanding, be GRANTED as such exigency ceased when the officers determined no persons were injured or in danger within the Sikut apartment and the evidence at issue was thereafter discovered and seized by the officers. "[A] warrantless search must be strictly circumscribed by the exigencies which justify its initiation."  *Mincey*, 437 U.S. at 393. Following a warrantless entry based on exigent circumstances, "[t]he officer's post-entry conduct must be carefully limited to achieving the objective which justified the entry –

the officer may do no more than is reasonably necessary to ascertain whether someone is in need of assistance and to provide that assistance." *Tierney*, 133 F.3d at 197-98.

Here, the officers testified that, within minutes of discovering Sikut in the upstairs bedroom and determining that no one else was in the apartment, injured or uninjured, the officers were no longer concerned about the safety of the residents of the apartment. Tr.I 35-36 ("McGonagle"); Tr.II 147-48 ("Stephens"); Tr.II 264 ("Scioli"). Instead, the officers agreed that upon encountering Sikut in a second floor bedroom, apparently asleep, the object of the warrantless entry and search of the apartment changed from domestic violence to a possible unlawful entry by Sikut. Tr.II 147-51. Of course, the officers did not immediately investigate the question of Sikut's correct identity because of any reasonable concern that the residents of the apartment were victims of foul play by Sikut, as at that point they had determined that no one else was in the apartment and there were no signs of physical violence or personal injuries. Tr.I 35-36; Tr.II 147-48, 263-64. Indeed, when the officers shifted the focus of their investigation to the question of Sikut's presence in the apartment and, later, that of his correct middle initial, they had no basis to believe Sikut had committed any offense sufficient to justify remaining at the apartment to investigate such possible offenses. Tr.II 263. Further, at that point, the officers admitted they had no basis to even suspect that Sikut had misrepresented his identity or that he was an intruder.[18] Thus, under the

---

[18] The Government's argument that the officers were concerned with Sikut's right to be on the premises is undermined by Stephens's admission that he did not believe Sikut was a burglar or trespasser and Scioli's admission that the later warrant check on Sikut was run, in part, because of Sikut's somewhat confrontational attitude toward the officers when the officers encountered him in the bedroom, not because of any serious concern by the officers that Sikut had misrepresented himself as a social guest or family member. Tr.II 158, 277. Finally, McGonagle testified it was irrelevant to him that Sikut showed the officers pictures of himself on the wall of the bedroom because being a relative or son of the apartment's

Fourth Amendment, the officers' authority to remain on the premises without a warrant ended when they determined no one in the apartment required assistance, and they realized, or objectively should have realized, they had no reasonable grounds to suspect Sikut was either a burglar or a trespasser, after the officers encountered Sikut in the second floor bedroom and Sikut proffered a plausible explanation for his presence in the apartment. *Mincey*, 437 U.S. at 393. Simply, the officers' continued presence in the apartment, including their ordering Sikut to accompany them to the first floor, following their inspection of the apartment's first and second floor areas, had utterly nothing to do with the asserted exigency, nor with any objective evidence of other serious criminality at the apartment by Sikut or anyone else. Tr.II 269. Once the officers became aware of such facts, they were required by the Fourth Amendment to leave the apartment. *Mincey,* 437 U.S. at 393 (warrantless search is limited to the initial exigency which justified the intrusion) (citing *Terry v. Ohio*, 392 U.S. 1, 25-26 (1968)). Instead, the officers proceeded to act upon their unreasonable suspicions regarding Sikut's identity and presence. [19]

## C.   Evidence in Plain View

The Government contends that the officers' seizure of physical evidence was nevertheless permissible pursuant to the plain view doctrine ("the plain view doctrine").

_____

residents "doesn't necessarily entitle [you] to be in the house." Tr.I 106 (bracketed text added). While technically correct as a legal matter, the court fails to see how the officers could have reasonably doubted Sikut's claim of being the occupants' son given that they were unaware of the family's surname and did not ask any neighbors whether Sikut was or could be a relative of the residents of the apartment and, as such, permitted to be on the premises. Tr.I 20.

[19] The absence of any reason to believe Sikut may have been an intruder is underscored by the fact that the Government did not challenge Sikut's standing to bring the present motion to suppress.

Government Response at 19.  Generally, "[s]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject to only a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357 (1967).  The plain view doctrine  is a well-established exception to the warrant requirement.  *Ruggiero v. Krzeminski,* 928 F.2d 558, 561 (2d Cir. 1991).  To withstand Defendant's motion to suppress, however, a police officer's access to the object seized in plain view must have been permitted under the Fourth Amendment and the officer must have had "probable cause to suspect that the item [was] connected with criminal activity." *United States v. Gamble,* 388 F.3d 74, 75 (2d Cir. 2004) (citing *United States v. Martin,* 157 F.3d 46, 54 (2d Cir. 1998) (quoting *Illinois v. Andreas,* 463 U.S. 765, 771 (1983))).  In general, to qualify a seizure based upon the plain view doctrine, "the initial intrusion by the police officer must be lawful so that he can justify being in a position to make his [plainview] discovery." *Ruggiero, supra,* at 561 (quoting *United States v. Moreno,* 897 F.2d 26, 32 (2d Cir.) (citations omitted), *cert. denied,* 497 U.S. 1009 (1990)).

Here, as discussed, Discussion*, supra,* at 19-31, it was not objectively reasonable for the investigating officers to believe exigent circumstances were present to justify remaining at the Sikut apartment at the time when the evidence at issue - Sikut's business cards and documents discovered in his briefcase, computer case and the briefcase, the computer and the computer case – were seized later in the scenario. Therefore, even if the officers' initial intrusion did not violate the Fourth Amendment, based on exigent circumstances, and even if the subsequently seized evidence was in plain view, as the seizure resulted from a police presence and actions no longer

35

permissible without a warrant, the evidence later seized is nevertheless subject to suppression. *Ruggiero,* 928 F.2d at 561.  Moreover, based on the record, the evidence seized by the officers was not in plain view of the officers during the period of time needed to determine the absence of the supposed exigency. Tr.II 228-29.  The record demonstrates that as the officers' observation of any items suggesting Sikut's possible false statements regarding his identity occurred well after the initial entry at a point, when even if exigent circumstances had existed, they no longer justified the continued investigation of Sikut conducted by the officers following their encounter with Sikut in the bedroom.  Thus, the officers' subsequent discovery of the seized evidence in the briefcase and computer bag occurred in violation of the Fourth Amendment, and the plain view doctrine can not legitimize the warrantless seizure of the items as the officers were not lawfully in position to make the plain view discovery when they did so after they reentered the apartment.

**D.      Taint from Original Illegality**

Finally, the court considers whether the evidence seized must be suppressed as "fruit of the poisonous tree,"  *Hudson v. Michigan*, 126 S.Ct. 2159, 2164 (2006), or may be admitted pursuant to the "inevitable discovery," "independent source" or "attenuation" exception to the Exclusionary Rule, or any combination thereof.  *United States v. Fisher,* 700 F.2d 780, 784 (2d Cir.1983).  Evidence which "would not have come to light but for the illegal actions of the police" will not be considered "fruit of the poisonous tree" on this criterion alone.  *Id.* (quoting *Segura v. United States,* 468 U.S. 796, 815 (1984)).  Such but-for causation *"*can be too attenuated to justify exclusion." *Hudson, supra,* at 2164 (quoting *United States v. Ceccolini*, 435 U.S. 268, 274 (1968)).

36

"[T]he more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"   *Hudson,* 126 S.Ct. at 2164 (citing *Wong Sun v. United States,* 371 U.S. 471, 487-88 (1963) (quoting J. Maguire, Evidence of Guilt 221 (1959))).  Where the causal connection is remote or "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained," the seizure may be sufficiently attenuated from the primary illegality.  *Hudson, supra,* at 2164.

Here, the officers' illegal entry into the Sikut apartment or, alternatively, their continued presence after any potential exigency proved non-existent, is the primary illegality.  Suppressing evidence seized inside the Sikut apartment would protect the Sikuts' privacy interest in their home explicitly protected by the Fourth Amendment, and thereby serve to deter police from warrantless entries without probable cause including an objectively reasonable ground for entry based upon exigent circumstances.  *Hudson, supra,* at 2164-65 (citing *New York v. Harris,* 495 U.S. 14 (1990) (incriminating evidence obtained from defendant's home was suppressed because illegal warrantless arrest)).  Further, the Government does not argue, and therefore has not established, as is its burden, *Nix v. Williams,* 467 U.S. 431, 444, 457 (1985), *cert. denied,* 471 U.S. 1138 (1985), by a preponderance of the evidence, that the officers would have discovered the evidence eventually by other lawful means.  *United States v. Fisher,* 700 F.2d 780, 784 (2d Cir. 1983).  Thus, the "inevitable discovery" exception to the Exclusionary Rule does not defeat Defendant's motion.  As the officers did not discover

the evidence by means other than the illegal entry, specifically by unlawfully remaining in the apartment after investigating the reported "domestic," the "independent source" doctrine is similarly inapplicable.  *Id.* at 443 (evidence is admissible if discovered "by means wholly independent of any constitutional violation.").  In short, after negating the existence of exigent circumstances, the officers acted without any reasonable basis to justify a confirmation of Sikut's identity or right to be present thereby directly exploiting the illegality of their initial entry or continued presence.

Finally, the officers' subsequent reentry into the residence, following the alteration between Scioli and Sikut immediately preceding seizure of the evidence at issue, also violated the Fourth Amendment.  When McGonagle pushed the apartment front door open, supposedly to free Scioli's foot, Tr.II 196, there was no legal basis for further entry into the apartment by the police either to protect Scioli's foot against possible harm or to arrest Sikut for any crimes.  Scioli testified unequivocally he did not at that point intend to arrest Sikut for harassment, Tr.II 253, and, according to Stephens, Stephens could not effectuate such an arrest because Scioli was the officer who had witnessed the violation. Tr.II 199-200.  Moreover, Stephens had not then completed the warrant check, Tr.I 50; Tr.II 246.  Therefore, that Sikut's name came up as a person wanted on the outstanding local court misdemeanor warrants cannot provide the rationale for reentry to arrest Sikut on such warrants. [20]  Had Scioli intended to charge Sikut for harassment, such charges could have been filed with the local state court and a warrant or appearance ticket for Sikut issued.

---

[20] The Government does not contend that the officer could have forcibly entered the apartment to arrest Sikut on the outstanding local court warrants for the minor offenses charged against Sikut in those proceedings.

"[C]ourts have permitted warrantless home arrests for major <u>felonies</u> if identifiable exigencies, independent of the gravity of the offense, existed at the time of arrest." *Welsh v. Wisconsin,* 466 U.S. 740, 752 (1984) (citing *United States v. Campbell*, 581 F.2d 22 (2d Cir. 1978) (warrantless entry permitted in armed robbery case) (underlining added)).   Importantly, such arrests are "prohibited by the Fourth Amendment, absent probable cause and exigent circumstances."   *Id.* at 750 (citing *Payton v. New York*, 445 U.S. 573, 583-590 (1980)).   Additionally,

> [w]hen the government's interest is only to arrest for a minor offense, . . . that presumption of unreasonableness is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate.

*Welsh, supra,* at 750.

Here, because of the minor nature of the charged offenses to which the local warrants pertained, the doctrine of exigent circumstances cannot support the officers' reentry of the Sikut apartment after the physical encounter between Sikut and Scioli at the front door of the apartment.   *Welsh,* 466 U.S. at 753 ("[A]pplication of the exigent circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense . . . has been committed.").   No special circumstances justifying the decision by the officers to reenter the apartment, directly leading to disputed discovery and seizure of the evidence is demonstrated in this record, nor is one advanced by the Government.   Significantly, in the instant case, as stated, Facts, *supra,* at 10, the officers did not confirm that Sikut had any outstanding warrants for a violation and a misdemeanor before they reentered the apartment.

Therefore, even if the Chief District Judge were to find the presence of exigent circumstances prior to the officers' initial entry into the apartment, nothing in the record establishes that any exigent circumstances supported the officers' decision to remain in, or to reenter the apartment, after leaving it.  Simply, upon their reentry, the officers, who were admittedly no longer concerned about the safety of any occupants of the apartment, had no reason to believe Sikut was on the premises without the permission of the occupants.  Tr.II 147-48, 264.  Moreover, as Sikut's warrant check (revealing a possible discrepancy in Sikut's use of "E" or "F" as his middle initial) had not been completed when the officers reentered the apartment, the officers did not have probable cause to believe Sikut had committed false personation, also a minor crime under New York law, specifically a class B misdemeanor.  N.Y. Penal Law § 190.23 (McKinney 2007).[21]  Such offense, absent a warrant, would not have justified the forcible reentry.  *Welsh, supra,* at 750.  Finally, as noted, Scioli testified that he did not, at that time, intend to arrest Sikut for harassment and, as discussed, Discussion, *supra* at 38*,* even if he had so intended there was no objective reason to enter to effect a warrantless arrest of Sikut for such harassment.  Tr.II 253.  Indeed, upon the officers' reentry, Sikut was not immediately arrested for any offense, including false personation or harassing officer Scioli.  Tr.II 253.

The Government nevertheless contends that the asserted exigency continued while the officers were conducting the warrant check to determine Sikut's identity, and that Scioli's placement of his foot in the outer door to maintain a physical presence in

---

[21]  Under New York law, class B misdemeanors are subject to a maximum of three months incarceration.  N.Y. Penal Law § 70.15[2] (McKinney 2004).

the apartment while the warrant check was being conducted, was justified by the exigency.  Government Response at 14-16.  However, as discussed, Discussion, *supra,* at 37-39, the record provides no support for this contention.  Rather, the record demonstrates there was no exigency and even if there had been one, it unambiguously ended when the officers' search of the apartment revealed no signs that any serious domestic disturbance had occurred prior to the officers' initial entry.  Prior to the reentry by of officers Scioli was, for all practical purposes, physically outside the apartment.  As such, it is not persuasive that Scioli's foot in the apartment's outer doorway can avoid a finding that the officers thereafter reentered the apartment without probable cause to arrest Sikut or based on exigent circumstances.  Finally, the Government does not contend that the officers could have reentered the apartment in order to arrest Sikut on the outstanding local warrants.  Nor does it argue that upon arresting Sikut, the search and seizure of the evidence at issue can be sustained as based on a search incident to a lawful arrest.

## CONCLUSION

Based on the foregoing, Defendant's non-dispositive motions (Doc. No. 14) are DENIED or DISMISSED as moot, and Defendant's motion to suppress should be GRANTED.  The Government's cross-motion for discovery (Doc. No. 15) is GRANTED.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     March 8, 2007
           Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the

Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the

Clerk of the Court within ten (10) days of service of this Report and Recommendation in

accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of

Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an**

**extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,*

892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys

for the Government and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      March 8, 2007
            Buffalo, New York